## Beck's Executors *versus* Graybill and Swartley.

A trust resulting by operation of law from the payment of the purchase-money for land is not within the statute of frauds and perjuries, and may be proved by parol evidence; and in such case it is error to apply the rule that parol contracts for the sale of land can be shown only by express agreement.

Where it appeared that a daughter furnished her father with a portion of the purchase-money to buy land for her, that the balance was furnished by him, charged to her as an advancement and deducted from her share in his estate, and that she went into possession,

*Held,* that it is the same as if the money was paid by her, and there is a resulting trust in her favour.

A conveyance of the land by the father to one, who having another wife, married the daughter, and claimed the land by virtue of the cash payment and advancement, gave him no title as an independent purchaser ignorant of her equitable title.

A former verdict and judgment in ejectment, between the same parties, or those claiming under them, is at least persuasive evidence in behalf of the party or his grantee in whose favour such verdict and judgment passed.

ERROR to the Common Pleas of *Bucks county.*

This was an action of ejectment by Deininger *et al.*, executors of Andrew Beck, deceased, against Wm. Graybill and Philip Swartley.

On the 3d of April, 1826, the executor of one Redline sold the land in question to Philip Swartley, under whom both parties in this action claimed title.

Beck's executor's title was founded on a deed from Philip Swartley to Jacob Heffner, dated 14th April, 1832, the consideration mentioned in which is $700; and on a sheriff's sale of the property on a judgment against Heffner in favour of Andrew Beck, for $400, entered July 6, 1850, and revived on the 27th November, 1852. On this revival a *fi. fa.* was issued, this property levied and condemned, a *ven. ex.* issued, and the property sold to the plaintiffs, with notice of the claim of defendants under Mary Swartley.

Graybill *et al.* claimed under a deed from Mary Swartley (formerly Mary Heffner), a daughter of Philip Swartley, dated 18th November, 1854, and she claimed to have title by virtue of a parol contract with Philip, her father, so far executed as to take it out of the statute of frauds. On the trial, it appeared by the testimony of John Swartley, a brother of Mary, that at the time the property was offered for sale by Redline's executor, she being desirous of purchasing it, agreed with her father that he should make the purchase for her; in pursuance of this arrangement she gave him of her own money $200, which he paid to Redline's executor. And the residue of the purchase-money, $500, was paid by him and charged in his book to his daughter as an advance-

ment, as appeared from the book, and that sum; as such, was deducted from her share in her father's estate after his death, on distribution. The sale was in the fall of 1825; in the spring of 1826 Mary went into possession. Her father never was in possession, nor pretended to exercise any act of ownership over the land. After this purchase, Jacob Heffner married Mary Swartley, and as her husband, obtained the deed of 14th April, 1832, from her father. At this time he had a wife living in Germany. Mary, before this, lived with a man named Weiss, who also had a wife and children in Germany. On the 18th November, 1854, Mary conveyed the land to Philip Swartley, one of the defendants, she having been divorced in 1850 from Heffner, and having, in 1853, recovered the land in an action of ejectment which she had brought against Heffner. The record of this action was in evidence.

The court (SMYSER, P. J.), after a statement of the manner in which the parties claimed, charged the jury as follows:

"In order to take a case out of the Statute of Frauds, especially where the parties stand towards each other in a near domestic relation, it is indispensable that the terms of the contract should be made out by direct, express, unambiguous, and positive proof, and that, not by the admissions or declarations of the grantor out of the presence of the grantee, but by the reliable testimony of a witness or witnesses who were present when the bargain was made, or who heard it from the mutual mouths of both parties in each other's presence. Such *ex parte* statements are of the most unreliable and uncertain kind of evidence to make out the terms of an agreement, often made at random, without reflection, are apt to be misconceived, and are often qualified by the time, occasion, and circumstances of making them, which may be either unknown to or forgotten by the witnesses. Therefore it is, that the law does not recognise them as sufficient to establish the *factum* of a contract for the sale of land, but ascribes to them, at most, the force of corroborating evidence only.

"Restraining the evidence as to the declarations and admissions of Philip Swartley and Jacob Heffner, respectively, out of one another's presence, to this purpose and effect only, we shall find that almost the only testimony we have, such as the law requires, to prove the fact of a contract and its terms, is that of John Swartley.

"He testifies that he heard the agreement from both Mary and Philip Swartley—not only when apart, but from them both when together, and that it was made before the sale by Redline's executor, and before Mary took possession. The terms of the agreement, as stated by him, taking his whole testimony, in chief and on cross-examination, together, seem to have been, that the old man was to buy this property for his daughter Mary, at the sale thereof by the executor of Redline, in the fall of 1825. That

[Beck's Executors *v.* Graybill and Swartley.]

she had $200 of her own money, which she was to pay him on it at the time, and that he was to advance the residue for her, charging it to her by way of advancement. If this was the contract, then, on compliance with its terms, on her part, it is apparent that her father ought either to have taken a deed from Redline's executor, directly to her, or if he took it in his own name, should have conveyed it to her.

"If Mary Swartley, pursuant to this arrangement, paid her $200, and was charged with the residue of the price, to wit, $500, as an advancement, which, after her father's death, was taken out of her share, it would at least raise a resulting trust in her favour; but it would not, alone, entitle her to a decree for specific performance in equity, inasmuch as the payment of the money admits of compensation without infringing on the statute. To entitle her to specific performance of the contract, possession pursuant to the contract, delivered at or presently after it, is necessary to be superadded to the payment of the money.

"If the jury find the contract to have been such as is testified by John Swartley; if they believe his testimony to be true and correct, then the court is of opinion that there is sufficient legal evidence of the contract itself.

"Then as to that part of part performance, which consists in the payment of purchase-money.

"The testimony of John Swartley is direct and positive that Mary gave her father the $200, which she had of her own money, and that he took it and paid it to Philip Miller, executor of Redline, on account of the purchase-money. That the whole price was $700. That he advanced the remaining $500, and charged it to his daughter by way of advancement; and that it was deducted from her share in her father's estate as such, after his death, on distribution. We have the book of advancements in evidence, in which Mary is charged as follows: 'And further in cash the amount of $500, towards pay on land.' We have the testimony of the Rev. Mr. Gile, that this charge was made in 1826, the time, as will be presently seen, when possession was taken under the sale by Redline's executor; and we have the will of Philip Swartley, directing the sums charged in his book of advancements to be charged against and taken out of the shares of his children.

"This advancement, we are to remember, was not of land, but of money. It is therefore the same as though she had received the $500 of her father, and then paid it to him on the contract between them as to the land. This testimony, therefore, if believed, would sufficiently show the payment of purchase-money.

"Nor do I see how, taking the whole of the testimony just as it is, a doubt can well arise to the effect that one of the charges of $200, in the book of advancements, may have been intended

[Beck's Executors *v.* Graybill and Swartley.]

to stand for the $200 which Mary was to pay at the outset. The one under date of November 10, 1830, shows, by its terms, that it was not; and as to the other, dated April 14, 1832, the testimony of Jacob Heffner (if true), as to what his father-in-law said when he gave him the deed, viz.: that he would go and charge the $200 yet backstanding on the building, which he had at first required his son-in-law to pay before he would give him the deed, shows its subject-matter with equal clearness, especially when the terms of the entry, and its date, are considered in connexion therewith.

" Then, as to the possession. John Swartley says, '*I guess*' that Mary Swartley moved on to the premises in spring of 1826. ' It was at that time to the best of my knowledge.' For the purpose of fixing the *time* of taking possession, this evidence might be wanting in the requisite certainty and precision. But other evidence relieves it of this defect. Peter Swartz testifies that Redline's sale was in the fall of 1825; that Philip Swartley lived half a mile from this lot; that Mary was then living with him after her divorce from her first husband, Rosenberger; that her father never lived on or took possession after he bought it; that Mary was the first who lived on it after the sale; and that she took possession in the spring, in April, directly after the deed was made from Redline's executor to her father. The time of her taking possession would seem, by this evidence, to be sufficiently ascertained to have been about as soon as her father was in a condition to give it to her; nor, in the absence of any proof of any other right, save what grew out of her arrangement with her father, or of any change in the arrangement from the one proven by John Swartley, do I see how the conclusion is to be avoided, that possession was taken under such arrangement.

" I have only to observe, further, one branch of the case: that if this had been a case of a gift from a father to his child, charging her therewith, by way of advancement, I might doubt whether it was intended at the time, as a present and executed gift, which would be requisite to save it from the Statute of Frauds; and on that doubt, would feel it my duty to instruct you that the proof of the contract was legally insufficient. But this is, according to John Swartley's testimony, the case of a purchase, and not a gift, accompanied by immediate payment of two-sevenths of the contract price; and is not, therefore, open to the same considerations, and to the same extent, which might operate in case of a gift from a father to a daughter.

" Still, however, no matter how good a title Mary Swartley derived to this land, in the way we have been considering, it may have been subsequently divested, either in fact or law. The plaintiffs maintain that it was, by her failure to give Jacob Heffner notice of her title, when, to her own knowledge, he was treat-

[Beck's Executors *v.* Graybill and Swartley.]

ing with her father for the title, and actually paying him the $200, borrowed by him for that purpose of Jacob Miller.

" If the testimony of Jacob Heffner, that he was lawfully married to a wife, then in being, in Germany, at the time he married Mary Swartley, be true, then his marriage with the latter was void and a mere nullity. Consequently she would not be under the protection of coverture, as to any transactions between them; and she would be the less entitled to set up such an excuse, if, as he alleges, she was informed of and knew the fact when they were married.

" If, then, it be true, that Jacob Heffner borrowed the $200 of Jacob Miller, and paid it, or any other money of his own, no matter whence derived, to Philip Swartley, as the consideration, in whole or in part, for the latter conveying this very land to him, to which she claimed title, and she was present and knew of it, and suffered him to pay it and take the conveyance, under the *bona fide* belief that he was obtaining a good title, and gave no notice of her own claim, but remained silent thereon, she, and all who claim under her, would be thereby postponed in title and estate to him and his alienees, or those deriving title through him; because such silence would be a fraud; and thereby the plaintiff would be entitled to your verdict. The testimony on this point consists mainly of the evidence of Jacob Heffner himself, or his declarations put in evidence, in connexion with other admissions of his, by the defendants. You are the judges of the truth and credibility of witnesses. You have heard the evidence as to his religious principles and belief, given to the court, on the objection to his competency; and as it is agreed by the counsel that it is to be considered as given also to the jury, you have a right to say how far his testimony is disparaged thereby, or by any other consideration that ought to affect it.

" In conclusion, I would only say, that as the defendants claim contrary to the letter of a most wise and wholesome statute, on the ground that equity requires that their case should be one of the recognised exceptions, they ought to bring themselves clearly, by positive, direct, and unambiguous evidence, within the equity they invoke; and if, on any of the points submitted to the jury, they shall think that the evidence falls short in strength and degree of this standard, they should on that ground alone find against the title set up by defendants through Mary Swartley, and render their verdict in support of the legal title of the plaintiffs.

" In conclusion, the transaction between Mary and Philip Swartley might have been placed on the ground of a parol declaration of trust, in which the *cestui que trust* paid the money, which the law will enforce, and which is not within the Statute of Frauds. (Murphy *v.* Herbert, and note *x.*) Some allusion has

[Beck's Executors *v.* Graybill and Swartley.]

been made to this by the defendants' counsel, but it has not been much insisted on.

"The distinction, in this class of cases, is between a verbal agreement by the grantee in a deed, to hold in trust for another, where the *grantee* himself pays the purchase-money, and one wherein the purchase-money is paid by the *cestui que trust.* The former will not be enforced—the latter may be—and although within the English Statute of Frauds, is unaffected by ours. The difficulty in the way is the inconsistency of the two grounds of title, and that is probably the reason why the one has not been more insisted on; although the inconsistency is not so strong or manifest, as if Mary Swartley claimed on the one ground, as the donee of a gift from her father, instead of setting up title as a purchaser for value.

The verdict of the jury was in favour of the defendants.

The errors assigned were to the charge of the court, with the exception of the first, which was the admission of evidence, but was not accompanied with the bill or substance of it.

*Lear,* for plaintiffs in error.—To sustain a title founded upon a parol contract in opposition to the legal title, the evidence must be direct, positive, and unambiguous: Poorman *v.* Kilgore, 2 *Casey* 365. It is doubted whether the evidence of a single witness is sufficient: Brawdy *v.* Brawdy, 7 *Barr* 157. Ex parte declarations are insufficient to prove a contract to convey lands: Rankin *v.* Simpson, 7 *Harris* 475; McCue *v.* Johnson, 1 *Casey* 308. The possession, in pursuance of the contract, must be notorious and exclusive: Atkin's Heirs *v.* Young, 2 *Jones* 15.

*Du Bois,* for defendants in error.

The opinion of the court was delivered by

LEWIS, C. J.—It is well settled that a trust which results by operation of law, from the payment of the purchase-money, is not within the statute of frauds and perjuries, and may therefore be proved by parol evidence. In such a case it is error to apply the rule which declares that parol contracts for the sale of lands can be shown only by an express agreement. Any evidence which satisfies the court and jury that the purchase-money was paid by the party claiming the benefit of the trust, is sufficient to establish it: Lynch *v.* Cox, 11 *Harris* 268. In this case there was evidence tending strongly to show that when the land was up for sale Philip Swartley agreed with his daughter Mary to purchase the property for her; that she had $200 of her own money which she was to pay him on it at the time, and that he was to advance the residue to her, charging it to her by way of advancement; that

[Beck's Executors *v.* Graybill and Swartley.]

Mary Swartley, the daughter, paid the $200 of her own money, and that Philip Swartley advanced the residue of the price, viz., $500, and charged it in his book as an advancement; and that on the settlement of his estate this sum was taken out of her share. It was also in evidence that the old man received the deed on the 3d April, 1826, and that Mary Swartley went into possession the same spring. The possession since that time has been in Mary Swartley, or in those who came in by, from, or under her. In this category we include, of course, the possession acquired by Weiss and Heffner, each of whom, at different times, acted as the husband of Mary Swartley. From the spring of 1826, to the present day, neither Philip Swartley, during his lifetime, nor his heirs since his death, ever demanded rent, or made any attempt to turn Mary Swartley out of possession. Jacob Heffner, while playing the part of husband to Mary Swartley, succeeded in obtaining the deed from her father. It is too clear for doubt that he obtained this deed not upon the footing of an independent purchase in ignorance of her equitable title, but as her husband, claiming on the ground of her right to it by virtue of the money paid by her in cash, and through the advancement. At the time that he married her he had a wife in Germany, so that his marriage with her gave him no rights as her husband. On the 6th December, 1850, she obtained a divorce from him. In 1851 she brought an ejectment against him, and on the 21st January, 1853, she recovered a verdict and judgment. On the 18th November, 1854, she conveyed the land to Philip Swartley, one of the defendants in possession. On the 18th September, 1855, the plaintiffs below purchased the property at sheriff's sale as the estate of Jacob Heffner, with full notice of the claim under Mary Swartley, and brought this ejectment on Heffner's title.

It is not necessary to determine the question whether the verdict and judgment in favour of Mary Swartley, against Jacob Heffner, were conclusive or not. The judgment was certainly a decree in favour of her equitable title. It was pronounced in an action brought after the passing of the Act of 30th April, 1850, the object of which was to restore the rule established in Seitzinger *v.* Ridgeway. The judgment in the former action was given after a fair trial. A jury of the country, after unexceptionable instructions on matters of law, rendered a solemn verdict in favour of her right. The Supreme Court affirmed that judgment. The trial was between persons from whom the present parties derive title. It was therefore between privies in estate. If the former decision be not conclusive it is certainly persuasive evidence in favour of the party who then succeeded: Koons *v.* Hartman, 7 *Watts* 20; Levers *v.* Van Buskirk, 4 *Barr* 309. The whole of the testimony on which it was founded was not laid before the court below. That is, it nowhere appears that the evidence given on the present trial com-

[Beck's Executors *v.* Graybill and Swartley.]

prises all that was produced on the former one. How then can the court say that the former decision was wrong? How are we to know that it was founded either on errors of fact or errors in law?

It is clear that parol evidence tending to establish a resulting trust may go to the jury, although it be not of that description which is called "direct and positive." If this be true as a general principle, there can be no possible objection to such evidence when introduced in connexion with a former decision in favour of the trust. The parol evidence and the record mutually corroborate each other. In the present case, if the jury believed that the father paid the $500 as an advancement to his daughter Mary, and that it was so charged in his book at the time, and was afterwards deducted out of her share of his estate, it is the same as if that much money was paid by her for the land. If the $200 was also her own money, then the whole consideration-money was paid by her, and a trust resulted by operation of law. It was not error to leave the evidence of these facts to the jury, in connexion with the support which the testimony derived from the former decision. The plaintiffs have not sustained any injury by the instructions given on the trial. They were quite as favourable to them as they had a right to expect.

The first error is not properly assigned,—the others are not sustained.

Judgment affirmed.